We'll hear counsel in JEDA Capital, etc. v. The Village of Potsdam, New York. JEDA Capital-56 v. The Village of Potsdam, New York. May it please the Court. My name is Justin Huffman, and I'm with the Camarda Law Firm, counsel for Appellant JEDA Capital-56 LLC. I just want to highlight two of the most critical points relating to this appeal. First, the lower court incorrectly found that the project completion agreement was valid as it was the product of severe economic duress. While the lower court noted that Mr. O'Neill is an experienced and sophisticated developer, this does not exempt him from any economic duress. As pointed out in our briefs, economic duress may arise where a party is being put at risk of being held in breach of an agreement with a third party. Here, of course, this occurred as JEDA was at risk of being held in default of its loan obligations. The Village, in this instance, was well aware of those loan obligations as the Village was required under the lease agreement to make those lease agreements directly to the bank rather than JEDA. As a matter of fact, the bank attorney and the Village attorney was one and the same, Mr. Andrew Silver. Certainly, this was a concerted effort by the Village and the bank to deprive my client of the water tower and its property. May I direct you to the economic duress argument? Yes, Your Honor. Mr. O'Neill is the only person that I could see on this record associated with JEDA, is that correct? Yes, Your Honor. The only other member is... And he was deposed? He was deposed? Yes, Your Honor. During the deposition, as I understand it, he testified that he understood or knew that he could that you quibble with, but that he made the considerate decision to sign that agreement anyway. Is that accurate? Yes, Your Honor. So if you've got that testimony from the only person associated with the company, how can you support a claim of economic duress? Isn't that a complete concession on that duress argument? I don't believe so, Your Honor. Why not? Because in that instance, regardless of any of Mr. O'Neill's and JEDA's ability to file a lawsuit, that doesn't change the obligations under the loan agreement with the third party. So JEDA was still at risk of being put into fault. So JEDA had to agree to those additional obligations under the project completion agreement. And that's the only argument you've got? Yes, Your Honor. Thank you. I would also like to note that the project completion agreement lacked any consideration, because in this instance, the project completion agreement required substantial additional work on the part of JEDA. However, JEDA received no additional consideration for that work effort besides that which was already required. Remind me then, hadn't the time periods expanded and now JEDA was looking to have an extension within which they could perform? I don't believe so, Your Honor. I thought there was a finite period within which JEDA had to perform, and that time passed. And that meant that the other side could terminate, but there was an extension granted. And at the same time that this release was, and the agreement containing the release was signed. Well, an extension was granted that didn't change the obligations. No, I understand that. But getting an extension would be consideration, wouldn't it? Well, I don't believe the additional extension there was part of, well, I take that back, I apologize. The, at the time the project completion agreement was entered into, the village had already waived any deadlines to that agreement. Well, there were also other things that JEDA got at that time under the PCA, correct? There were certain other disputed items that had been resolved, that were resolved there. Elevation and the, how to obtain, the way to obtain water and matters of that sort. Well, Your Honor, the crucial point under the project completion agreement is that the village admitted in that project, right in that agreement in fact, that the water tower was substantially complete. Now, in the original lease, delivery of possession was to trigger upon substantial completion. We're focusing now on consideration, whether there was consideration at the time of the agreement. Because that's what you're claiming, there was no consideration, and therefore the agreement was not valid, right? Yes, Your Honor. Okay, so that's what we're looking at now. It doesn't take much in the way of consideration to, or benefits to amount to consideration. I've suggested a few, and you haven't, you refuted them. Are you, are you, this is under, the agreement was under New York law, right? Yes, Your Honor. Are you familiar with the New York general obligation law section 15-303? I don't have it memorized, Your Honor. All right, well, let me help you. It provides that a written instrument which purports to be a total or partial release of all claims shall not be invalid because of the absence of consideration. Does that refresh your recollection about what section 15-303 says? Yes, Your Honor. Okay, so given that provision, why does the village even have to show that there was consideration? Well, there were additional obligations that fell under that agreement. So, but was it not a partial release of claims? Well, Your Honor. Was it, that's yes or no? Yes, Your Honor. So, given what I just told you, 15-303 says, wouldn't that provision apply to a disagreement? Well, I don't believe so, Your Honor, for, as the final point that I'd like to make is that, quite simply, the project completion agreement didn't, even if it is determined to be valid, did not waive all claims. Most critically is that the PCA released only claims accruing up to the date of the agreement. There are certain claims, particularly the village's taking of the property, removing Jetta's lock from the property, placing its own lock on the property, and preventing Jetta access to its own property, which was placed after the date of the agreement. Mr. Hoffman, you've reserved two minutes. You can take it now, if you'd like, or reserve. I'll reserve, Your Honor. Thanks very much. Mr. Johnson? Thank you. Good morning, Your Honor. May it please the Court, Greg Johnson here on behalf of Appellia Village of Potsdam, which I'll refer to as the village, to save some trees. I briefly would like to sort of frame the issue in terms of where the parties were, as this record clearly establishes, and as I think Judge Mordew below did an excellent job of analyzing the record. By the time the parties got to the PCA, or the project completion agreement, there had been a whole history, as Your Honor has already alluded to. There were two prior agreements. One, of course, was the lease agreement that began this relationship that specifically set a deadline for substantial completion, which meant this tower would be put into service, that is, it would safely be able to provide and hold water for residents, by December 1, 2008. That deadline undisputedly was not met by Jetta. The lease addendum that was executed on notably December 1, 2008, set a new deadline, a subsequent delayed deadline of March 16, 2009. It's undisputed that that deadline was not met. So by the time the parties got to the end of that lease addendum period, it's undisputed in this record that completion and performance had not been timely met. The parties had a variety of other disputes. And I note for the record that later on in this litigation, Mr. O'Neill, through his declaration and through his expert, both testified that even in their view of the world, the tower wasn't substantially completed until late April 2009. So they've admitted on this record that they blew both the deadline and the lease, and the deadline and the lease addendum. So getting to the issue, jumping ahead to the issue of economic duress, and as this court has recently indicated in Interfarm and other cases as well as the Court of Appeals, this is an equitable doctrine reserved for extreme cases where a party makes a wrongful threat, not just a threat that business parties might make in negotiations, but a wrongful threat that they make unlawfully. That doesn't mean that the two sides have a different perspective on their relative performance. That means that they're threatening to do something that is patently illegal, and that doing so the party with presumably the stronger bargaining power is literally depriving the other party of their free will to make a decision. So those are the basic elements. In effect, it's not too different from economic extortion. What could support equivalent charge? I think it's got some of the same elements, Judge. And when you look at the undisputed record evidence in this case, as Judge Mordew did, none of those elements are met. And, in fact, many of the exceptions to this limited doctrine have been met. Your Honor, I've already covered the fact that he read the PCA, admitted that under a sworn testimony, that he understood it, that's very important, that he consulted with the counsel. Counsel was there. I'm sorry. Counsel was there. Counsel was present. Counsel advised him not to sign it. And here's the other thing that I think is maybe overlooked in my brief, but I'd like to point out. There's a six-month period of time when the first PCA draft is presented to Mr. O'Neill and when he signs it. So if you look at his declaration, he admits that this was presented to him in February 2009, and he decided finally in August to not sue, which is clearly one of his options. He also admits in that testimony, as set forth in Judge Mordew's decision, that during that six-month period of consideration, he knew that he could bring a lawsuit. He knew that state law or Article 78 in New York would provide him a remedy. And, frankly, in six months, you can bring an Article 78, you can get an injunction if you really have a legal basis for it. So this is not a situation where there was some exit circumstances. This is a situation where this record plainly sets forth that Mr. O'Neill made an informed, calculated, and strategic decision to enter into that PCA. In addition, once that PCA is signed, and there's no dispute about that, he doesn't repudiate it. It's 21 months past before he brings his action saying that somehow the PCA that I signed should be invalidated or should be rescinded. 21 months. This court and the New York courts have made crystal clear that a prompt repudiation of the agreement is absolutely necessary in order to even make out a colorable duress claim. And I could find no cases that indicated that 21 months didn't far exceed that. The other piece, which is when you talk about the economic duress, this is an economic doctrine, of course, that is intended to empower courts to exercise their equitable powers. In this record, Mr. O'Neill admits that when he sat down with the advice of counsel, which he chose to ignore and sign this agreement, that he was planning on suing him anyway if things didn't work out the way he wanted. I mean, that's right in Judge Mordew's decision and it's right in his sworn testimony. So he literally is coming forward to the court below and to this court in equity, trying to advance this equitable doctrine of economic duress when he has admitted in his sworn testimony that he had unclean hands the day he decided to ink that agreement for his purposes. And I would submit that that is the death knell to even his attempt to even invoke this equitable doctrine. And then, of course, as the lower court indicated, not only do we have a lack of repudiation, not only do we have actual consideration, but we also have ratification. If you look again, I look at Judge Mordew's decision when he recites Mr. O'Neill's testimony, and at the end of that testimony, he admits that although he didn't like it, he performed in part under that PCA. First of all, he got more time, which is critical in this case. Number two, he paid the village's engineers, which was a requirement spelled out in the PCA. He said, I didn't like it, I didn't think I should have to, but he did. And then he submitted a request for acceptance of the tower, which is one of the things that was set forth in the PCA. So for a period of time after executing the project completion agreement, there's no doubt that JEDA performed under it and thus ratified it. But you think we could – you prevail on the rest. We don't have to get to ratification. I'm sorry? You prevail on the rest. We don't have to get to ratification. That's true, Judge. I'm just covering that because it's in the brief. And I just have a couple other – once we set aside the issue of the rest, I think the rest of JEDA's appeal is in part based on a very curious and selective reading of some of this basic contract language. And I won't bemoan the court, but I just want to point out two of those. Number one, there's a lot of discussion by JEDA in their brief about this use of the phrase substantial completion in the whereas clause of the project completion agreement. That's not an admission. First of all, it's a whereas clause. Second of all, that sentence doesn't say that the village acknowledges that the tower is substantially complete pursuant to the terms of the lease. What that actual sentence says, if you continue to read it, is that the village refused to accept delivery as specified in the relief. So that whereas clause is not an admission in any form or fashion. And if you read the entire sentence, I submit that that's plain. Last issue about construction of the contract language. There's been a lot of discussion about the scope of this indentification clause as it's labeled in paragraph six of the PCA. There's basically two sentences and two components to that. One is a covenant not to sue, and the second sentence is a broad general release. And JEDA puts a lot of emphasis in their arguments that somehow the temporal scope of that release is limited. Well, that's only true of the covenant not to sue. The covenant not to sue says that JEDA agrees not to sue for any cause of action in equity, et cetera, up until the day of this agreement is signed, period. The second sentence, the release language, which is extraordinarily broad in subject matter, does not have that proviso. It is not explicitly retroactive. So this whole argument that somehow the temporal scope of the release contained in the PCA is simply not supported by the language. In closing, although I don't think that the court needs to reach that, and this and the lower court didn't, this opportunity of an Article 78 or a plenary action in state court clearly would have provided JEDA with an employment to exercise its due process rights at the state level rather than trying to bring a 1983 claim and fashioning its contract disputes that way. So while I submit that the PCA is absolutely enforceable and that the economic duress does not provide justification for avoiding that arms-length agreement negotiated over six months, even if that were the case, or even if the release language wasn't as broad as I submit it clearly is, then the 1983 claims that invoke this court's jurisdiction are legally infirm for its failure to exercise and exhaust administrative remedies that were plainly available to him. Judge Mordew dismissed the supplemental claims. Have they been pursued at all in the state courts? No. Thanks very much. Thank you. All right, we'll hear from Mr. Huffman, who's reserved two minutes. Your Honors, I'd just like to address a couple of quick things. One, the delivery date in the original lease was not a firm date, and it provided for a date and said, or as soon as possible thereafter. That's in the appendix at page 49. And at that point, if that date should pass, then the village can elect to cancel the lease, which it did not elect to do so. Mr. Johnson referenced that Mr. O'Neill had unclean hands here, saying that he admitted that, however, I'd like to note that the village admits that Mr. O'Neill commenced performance under that agreement. However, Mr. O'Neill did not receive any benefit under that project completion agreement. But lastly, and most critically, is that the village does not seem to offer any response to the issues that arose after the project completion agreement, which could not have been released under that PCA. Like I said before, specifically the village's seizure of the property, taking off Jedda's locks, putting its own locks on, those events took place after the project completion agreement. Well, one argument is that your client ratified the PCA. Well, Your Honor, I believe the ratification requires accepting the benefits under an agreement, which Mr. O'Neill received no benefits under that agreement. So I don't see how he could have ratified any such agreement. Thanks very much, Ms. Alfred. We'll reserve decision.